## GIMBEL et al. v. HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK.

### No. 325.

Circuit Court of Appeals, Second Circuit.
April 6, 1936.

Blandy, Mooney & Shipman, of New York City (William West Shaw, of New York City, of counsel), for appellants.

Conboy, Hewitt, O'Brien & Boardman, of New York City (John Vance Hewitt and Hobart L. Brinsmade, both of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a decree dismissing a bill in equity by which the plaintiffs sought to share in a pool of securities, set aside by the Harriman National Bank to secure depositors in its "trust department." The plaintiffs were trustees under two separate trusts and had been accustomed to use the bank as their depositary; several times before they had sold securities on deposit with the bank, and it had been their habit to deposit the proceeds in two checking accounts in the "banking department," one for principal and the other for interest; each styled a trust account. When they opened a safe-keeping account on March 5, 1932, they instructed the bank that "all communications pertaining to the account shall be signed by any two of the three trustees, one of whom shall be Louis S. Gimbel, Jr."; in all earlier transactions they had always signed such a joint authorization. On February 10, 1933, becoming anxious about the bank's condition, they drew down their checking balances of $66,000 to $72, and on the twentieth transferred all their securities to the Guaranty Trust Company, except $39,000 of United States bonds in each trust, which they ordered the bank to sell. This it did, and when the broker sent back his cheque, it was credited to the plaintiffs in the "trust department," but immediately charged out and credited to their checking accounts as principal. Mrs. Gimbel had gone to Florida, and on the twenty-seventh Louis Gimbel, becoming still more alarmed, went to see Pidwell, a trust officer of the bank, and told him that he was concerned at leaving the proceeds unsecured in the banking department. Pidwell suggested that he withdraw cur-

rency and leave that on deposit in the trust department; Gimbel answered that he could not do this because two names were necessary on a cheque, and it would take too long to get his mother's signature. He then asked whether an account in the trust department would not be safer, and Pidwell said yes. Gimbel says that Pidwell then told him that the money would be transferred to the "safe-keeping" account, and that Pidwell would later draw up a confirmation for Gimbel to send to Florida to his mother. Pidwell says that he told him he had authority to transfer the funds, and that he would do so, but that there must be two signatures. He promised to make the transfer on the understanding that the other signature would be supplied after the transfer was made. On the same day Pidwell initialled two slips charging each checking account with $39,000, and crediting the trust department account in the plaintiffs' favor with the same amounts. After importuning Pidwell, or his assistant, Davis, every day for some written confirmation of the transaction, Gimbel wrote him on March third that the funds, as he understood it, were then in the trust account; Pidwell answered that "in accordance with your previous request and pending definite instructions over the signatures of both of the trustees we have withdrawn the moneys * * * and placed them in the principal cash account in the custody department. Incidentally your letter of instructions should request that the money above referred to be credited to this account. * * * You of course appreciate that the funds as now deposited are not subject to withdrawal by cheque." Pidwell on the third or fourth dictated a letter for both plaintiffs to sign which read as follows: "This is to authorize you to transfer the funds received * * * from the principal account * * * to the cash account in the custody department. * * * Will you please acknowledge receipt of this letter confirming that the above instructions have been carried out." This was forwarded to Mrs. Gimbel in Florida and came back to the bank on the ninth, after it had closed its doors on the fourth.

The bank kept a pool of securities in accordance with section 248(k) of title 12, U.S.Code (12 U.S.C.A. § 248(k), as collateral for trust funds, or funds held for safe-keeping, which it did not wish to keep separate but to mix with its own assets,

as the statute permitted. On the twenty-seventh the aggregate of the deposits so secured was $885,197.36, including the $78,-000 belonging to the plaintiffs; on the same day the pool was $886,793.55. By Friday, March third, the pool had dropped to $873,093.75, and the deposits had risen to $933,000. On the following Tuesday, March 7th, $56,000 of new securities were transferred to the pool, and $30,000 more on Friday the tenth, both of which transfers the bank's conservator afterwards cancelled. The securities in the pool have risen so much since 1933 that there is now sufficient to pay off all the "trust" deposits including the plaintiffs'; even after the transfers of March seventh and tenth are deducted. The question is, whether the entries made by Pidwell on February twenty-seventh secured the plaintiffs' deposit, or whether the transaction still remained in fieri. The judge believed that the transfer had not been completed and dismissed the bill.

█ Although the parties spoke as though funds were to be transferred from the banking to the trust department, and perhaps thought that this was the effect of what they did, nothing of the sort took place, or could have taken place without a withdrawal. The plaintiffs had allowed the bank to mix the proceeds of the sale with its assets and were content to become its creditors. Gimbel expressly refused to draw out currency and deposit it for safe-keeping; that would take longer than his fears demanded. The parties were only debating the securing of the old debt by entering it among "the trust accounts," which enjoyed the benefit of the statutory pool. The transaction therefore at most did no more than create a security for an existing debt, and possibly for that reason was a voidable preference, except that it was neither pleaded nor proved. Did Pidwell mean presently to charge the pool with the plaintiffs' deposit on February 27, 1933; if he did, did he succeed in so charging it? We have no doubt that he had the authority; he was entrusted with the receipt of funds in the trust department, and if the plaintiffs had come to him that day with new funds he could properly have received them for deposit, and later turned them into a secured debt under section 248(k). Looked at in terms of power, it was certainly not vital that currency should have been withdrawn and

deposited for safe-keeping and then used by the bank. Nor was it vital that Mrs. Gimbel should add her name to the request; that condition was for the protection of the trusts, but the trustees might dispense with it, for the deeds had not made it a limitation on their powers. Pidwell might have insisted upon it for the bank's protection, but again he need not; he could have dispensed with it, for his powers also were not so limited.

 If then the parties actually meant that the account should be secured on the twenty-seventh, secured it was; and if they expected that this should await the written authorization of both trustees, it was never secured, for the condition was fulfilled too late. We must gather their intent by inference, the burden of proof resting on them. There can be no fair doubt that taken alone the entries of February twenty-seventh were an expression of present intent to secure the plaintiffs; Pidwell himself initialled the tickets authorizing them to be made. Unquestionably he expected the plaintiffs to complete the transaction by delivering the joint written authorization; his letter of March third says that the transfer has been made "pending definite instructions over the signatures of both of the trustees." Yet it does not follow that until those instructions arrived, the plaintiffs were not to be protected; the same letter told them that they could not draw, which was consistent only with a completed transfer. Moreover, Gimbel had especially wanted immediate protection; he knew he could withdraw the money and deposit the currency if he got his mother's signature; as we have just said, it was the necessary delay which forbad that course. We can only interpret Pidwell's purpose as being to give the temporary protection about which Gimbel had repeatedly shown himself so solicitous, and if the two signatures were not forthcoming, to reverse the entries. There was no reason why he should not do this; he could not be called to account by Mrs. Gimbel for a temporary benefit even though she had not asked it; if she wished to withdraw, her signature must be added to a cheque, and if such a cheque came in before the authorization, he was free to honor it.

There were securities enough on February twenty-seventh to secure the plaintiffs, and while the margin was too narrow for safety, we cannot say that Pidwell could not have intended so to charge the pool, for he did not actually impair the security of the other depositors. It is true that by March third this had changed; there was a very substantial shortage, about $60,000, which the bank tried unsuccessfully to make good on the seventh and the tenth. No doubt Pidwell did assume an undue risk when he loaded the collateral so heavily, but if inferences are proper, it is fair to suppose that he expected, if need came, to restore the pool just as he tried to do. We need not therefore answer whether actually to overcharge it would have been beyond his authority; there was apparently no rule which required a definite margin. Thus it seems to us that to construe the transaction as only prospective and dependent upon the receipt of a joint authorization, necessarily reads it in a sense other than as Gimbel understood it and as Pidwell must have known that he would understand it. Nothing but present security would protect him; anything else would grievously mislead him; had he supposed that he was not protected, as things turned out, he could have secured his mother's signature by aeroplane and withdrawn currency before the bank failed.

Decree reversed; decree directed for the plaintiffs.